UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BOB BEASLEY,

             Plaintiff,

     v.

DOUG WADDINGTON, and LOREN SHUMATE,

             Defendants.

Case No.  C05-5388RBL

REPORT AND RECOMMENDATION

Noted for May 12, 2006

     This case has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4.  The matter is before the court on defendants' motion for summary judgment (Doc. 18).  After reviewing the motion, plaintiff's response, and the remaining record, the Court should deny defendants' motion for summary judgment.

## FACTUAL BACKGROUND

     Plaintiff, a state inmate at Stafford Creek Corrections Center, brings his complaint pursuant to 42 U.S.C. § 1983 alleging that his civil rights were violated when defendants allegedly violated his due process rights when his "Extraordinary Medical Placement" was revoked and he was returned to total confinement at the Stafford Creek facility.

     Mr. Beasley was incarcerated on December 24, 2003, pursuant to a judgment and sentenced arising out of Lewis County.  Mr. Beasley is diabetic and has lost his right leg below his knee.  Since his incarceration plaintiff has had numerous acute and chronic medical conditions that have necessitated treatment.  During his first year of incarceration plaintiff was treated for a severe infection in his left foot, he was diagnosed with prostate cancer, and he suffered a near fatal heart attack.  In 2004, Mr. Beasley

1  petitioned the Department of Corrections for an Extraordinary Medical Placement ("EMP") pursuant to
2  RCW 9.94A.728(4)(a).
3     RCW 9.94A.728 authorizes the Secretary of the Department of Corrections, or his designee, to
4  release an offender from total confinement to an extraordinary medical placement:

> (4)(a) The secretary may authorize an extraordinary medical placement for an offender when all of the following conditions exist:
> (i) The offender has a medical condition that is serious enough to require costly care or treatment;
> (ii) The offender poses a low risk to the community because he or she is physically incapacitated due to age or the medical condition; and
> (iii) Granting the extraordinary medical placement will result in a cost savings to the state.

Pursuant to RCW 9.94A.728(4)(d), the secretary may revoke an extraordinary medical placement "at any time."

Mr. Beasley's petition was granted by the Secretary of the Department of Corrections on January 25, 2005, and two days later, on January 27, 2005, Mr. Beasley was granted an EMP. The EMP allowed Mr. Beasley to reside outside of a prison facility to serve his sentence with very strict conditions closely monitored by his community custody officer ("CCO"), Mr. Shumate.

Mr. Beasley's conditions of EMP included the following: plaintiff was required to live at the home of his son/sponsor, at 220 E. Tahuya Drive in Shelton, Washington; he was not permitted to live at or even return to his own home in Cowlitz County; plaintiff's son/sponsor was required to abide by plaintiff's conditions of EMP and to notify DOC of any violations; plaintiff was required to be on Electronic Home Monitoring the entire time that he was on EMP; he was not permitted to leave the Tahuya Drive home except for pre-approved medical appointments and medical emergencies; before being permitted to leave the home, plaintiff was required to obtain a travel permit, which restricted where he could go, the time that he could leave the home, the time by which he was required to return to the home, and the person(s) and in whose company he was required to be when away from the home; wen he was permitted to be away from the home to attend a medical appointment, plaintiff was not allowed to make any unauthorized stops; with the exception of his sponsor, his sponsor's children, and his significant other, plaintiff was not permitted to have any visitors without written prior-approval; before his community custody officer would approve any visitor, the CCO had to meet with the prospective visitor, run his/her criminal history, and have the person

1  agree in writing to abide by plaintiff's EMP conditions; and finally, plaintiff was not permitted to consume
2  alcohol or other non-prescription controlled substances and was required to submit to urinalysis at Mr.
3  Shumate's direction.

4      On January 28, 2005, Mr. Shumate went to the plaintiff's son's residence in Shelton to meet with
5  plaintiff about his EMP conditions, outlined above. Mr. Shumate reviewed all of these conditions with
6  plaintiff and his significant other, Carolyn Hope. Both plaintiff and Ms. Hope signed the conditions,
7  indicating that they had read and understood the conditions.

8      On February 1, 2005, Ms. Hope went to Mr. Shumate's office to request permission to take Mr.
9  Beasley to his podiatrist the following day. Mr. Shumate prepared a travel permit that authorized plaintiff
10 to travel to 1812 N. 13th Loop, Shelton WA, for the purpose of a medical appointment with Dr. Rice. The
11 permit authorized the Plaintiff to leave his son's residence on February 2, 2005, at 4 p.m., and required him
12 to return to the residence that same day by 6:30 p.m., and provided that "no other stops are approved, to
13 be in the company of Carolyn Hope at all times."

14     Mr. Shumante monitored Mr. Beasley's travel and visit to Dr. Rice's office. Mr. Shumate observed
15 Mr. Beasley and Ms. Hope return to their vehicle following the visit and watched the car as it traveled past
16 the Mason General Hospital, which was across the street from Dr. Rice's office, past numerous public
17 locations with public telephones, including gas stations, and onto Highway 101 North, away from
18 plaintiff's son's residence. Mr. Shumante followed the car plaintiff's car for approximately 14 miles to
19 Hoodsport. At approximately 5:58 p.m., plaintiff's car stopped at a home belonging to his daughter. Mr.
20 Shumate observed a female come to the car and lean down as though talking to the passenger.
21 Approximately 13 minutes later, the plaintiff's car exited the driveway and headed back towards plaintiff's
22 son's residence. At 6:50 p.m. plaintiff's car was approximately two miles from his son's residence.

23     On February 2, 2005, Mr. Shumante, with assistance from state law enforcement officers, took Mr.
24 Beasley into custody. Mr. Shumante informed Mr. Beasley that his EMP was being revoked due to
25 violations of the terms of the EMP. After he was taken into custody and during transport to a prison
26 facility, Mr. Beasley apparently suffered an anxiety attack or other medical condition which required him to
27 be taken to a hospital. After his medical condition was cleared by hospital staff, Mr. Beasley was taken to
28 the Washington Corrections Center, and the next day, on February 3, 2005, Mr. Beasley was transferred to

REPORT AND RECOMMENDATION
Page - 3

his current place of confinement, Stafford Creek Corrections Center.

As noted above, plaintiff challenges the revocation of his EMP by defendants and he specifically claims the revocation process used by defendants denied him his right to due process when he was denied both a written notice of the revocation and a hearing to challenge the basis for the revocation. Plaintiff asks for the following relief: (i) his EMP should be reinstated, (ii) the Department of Corrections should establish a written policy and procedure regarding the revocation of an EMP, and (iii) he should be awarded monetary damages. Defendants motion for summary judgment is based on the argument that plaintiff has failed to state a claim and they are entitled to qualified immunity.

After carefully reviewing the matter, the court finds inmates placed on EMP do not have a liberty interest in such placement protected by the Fourteenth Amendment's due process clause. However, Mr. Beasley 's revocation of his EMP and placement at Stafford Creek Corrections Center to complete his term of incarceration may impose atypical and significant hardship on him in relation to the ordinary incidents of prison life. For these reasons further detailed below, defendants' motion for summary judgment should be denied.

## DISCUSSION

A. SUMMARY JUDGMENT

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257. Mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988).

To sustain a cause of action under 42 U.S.C. § 1983 a plaintiff must assert that (a) the defendant acted under color of state law, and (b) the defendant's conduct deprived the plaintiff of a constitutional right. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988); Rinker v. Napa County, 831 F.2d 829, 831 (9th Cir. 1987). The Due Process Clause of the Fourteenth Amendment provides that no

REPORT AND RECOMMENDATION
Page - 4

state shall deprive "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Substantive due process protects individuals against arbitrary and unreasonable government action which deprives any person of life, liberty, or property. Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1234 (9th Cir. 1994). Procedural due process does not protect the actual deprivation of the life, liberty, or property in question, but ensures that individuals are given an adequate opportunity to challenge the government action. Carey v. Piphus, 435 U.S. 247, 259 (1978). To state a claim for a violation of procedural due process, plaintiff must show (1) a protected property interest has been taken, and (2) procedural safeguards are inadequate. Board of Regents v. Roth, 408 U.S. 564, 569-70 (1972).

The question regarding a prisoner's right to less restrictive custody or placement in a particular prison or facility has been addressed by the courts on several occasions. A prisoner "has no justifiable expectation that he will be incarcerated in any particular State or unit." Olim v. Wakinekoa, 461 U.S. 238, 245 (1983), and there is no specific constitutional right to a particular custody status within prison population, Hewitt v. Helms, 459 U.S. 460, 467-68 (1983). The U.S. Constitution does not guarantee that the convicted prisoner will be placed in any particular prison. Meachm v. Fano, 427 U.S. 215, 224-225 (1976). Only when a prisoner is released, i.e., paroled, are U.S. Constitutional due process protections regained. *See* Morrisey v. Brewer, 408 U.S. 471 (1972)(a parolee has a liberty interest in remaining conditionally free on parole).

Here, the conditions imposed on his EMP were very strict and monitored closely by the CCO. While he may have had more freedoms and flexibility than when he was housed in a traditional prison facility, he was not allowed a life generally free of supervision and significant restrictions. As noted above, Mr. Beasley was confined to his son's residence on Electronic Home Monitoring. He was not permitted to leave the residence except for pre-approved medical appointments and medical emergencies with significant time limitations. With the exception of his son, his son's children, and his significant other, plaintiff was not permitted to have any visitors without written prior-approval. Mr. Beasley was not permitted to consume alcohol or other non-prescription controlled substances and was required to submit to urinalysis at the CCO's direction.

In accordance with the EMP statute, the placement could be revoked at any time by state officials. In sum, the restrictions and limitations attached to Mr. Beasley's EMP do not give any expectation of a

REPORT AND RECOMMENDATION
Page - 5

1  right protected by due process.  *See* Asquith v. Department of Corrections, 186 F.3d 407
2  (1999)(convicted prisoner remained under confinement and had no protected liberty interest when he was
3  placed in a halfway house).

4   Having concluded that the U.S. Constitution's due process clause does not protect Mr. Beasley's
5  placement in EMP and the subsequent revocation of that placement, the court next must consider whether
6  the state law or prison regulation has created a "protected" liberty interest.  In determining whether a state
7  law or regulation has created a protected liberty interest entitling an inmate to the procedural protections
8  afforded by the Due Process Clause the court no longer focuses on the language of prison regulations to
9  determine whether such regulations or laws place substantive restrictions on an official's discretion.
10 Sandin v. Conner, 515 U.S. 472, 483 (1995); Mujahid v. Meyer, 59 F.3d 931, 932 (9th Cir.1995).

11  In Sandin, the Supreme Court was called upon to determine whether Hawaii prison regulations or
12 the Due Process Clause afforded Sandin a protected liberty interest that would entitle him to procedural
13 protections before transfer into segregation.  The Court held that prisoners have liberty interests protected
14 by the Due Process Clause only where the contemplated restraint "imposes atypical and significant hardship
15 on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484.  When
16 considering atypical and significant hardships, the court must compare the prisoner's liberties after the
17 alleged deprivation with the normal incidents of prison life.  Sandin, 515 U.S. at 485-486.

18  In response to defendants motion for summary judgment, Mr. Beasley's friend and significant
19 other, Carolyn Hope, submitted a brief along with several attachments on behalf of plaintiff.  According to
20 her statements, plaintiff argues he has been treated with deliberated indifference to his medical care ("his
21 care being delayed, at best to being totally ignored to even to being cited with infractions for 'faking it'").
22 Plaintiff states he has sustained many painful falls at the prison facility when he has been transferred into
23 and out of his bed.  Plaintiff further states he has had to give himself sponge baths for the past 10 months
24 and he is normally locked in his cell 23 hours per day, allowing only one hour out for exercise.

25  Generally, the court does not accept pleadings from individuals on behalf of others, unless they are
26 licensed attorneys.  The unauthorized practice of law is a crime in Washington. RCW 2.48.180.  Ms. Hope
27 has signed plaintiff's response to the motion for summary judgment with her name on behalf of Mr.
28 Beasley, presumably with a Power of Attorney or Durable Power or Attorney.  The court notes that under

certain circumstances a representative may petition the court without being an attorney. RCW 11.94.100. However, in this case, Ms. Hope has not shown that Mr. Beasley was incapacitated at te time of the filing or otherwise unable to protect his own interests.

Nevertheless, the court has carefully reviewed the attachments to plaintiff's response to summary judgment. The court particularly notes the contents of Mr. Beasley's grievances and kites sent to prison officials regarding his medical treatment and care, Ms. Hope's statements and declarations, Mr. Beasley's son's statements and the statements and opinion of Dr. Neilsen, who was one of Mr. Beasley's physicians prior to his incarceration. Defendants did not file a reply to support their motion for summary judgment. The evidence submitted by these individuals clearly raises questions regarding the issue of whether Mr. Beasley's incarceration at Stafford Creek Corrections Center poses atypical and significant hardships in relation to the ordinary incidents of prison life. The conditions, treatment and care, as alleged by these individuals, who are familiar with Mr. Beasley's medical needs, possibly also raises concerns that may give rise to protection by the Due Process Clause of its own force. *See* Vitek v. Jones, 445 U.S. 480 (1980); Washington v. Harper, 494 U.S. 210 (1990)(prisoner's retain liberty interests related to their bodily and mental integrity).

To conclude, while the court does not find a due process right associated with the state's revocation of Mr. Beasley's EMP, the state law allowing EMP placement and the conditions imposed on Mr. Beasley since his return to total confinement raise material issues of fact regarding the issue of atypical hardship in relation to ordinary incidents of prison life.

Defendants argue alternatively, that regardless of plaintiff's constitutional right to procedural due process, they are entitled to qualified immunity from damages. State officials are entitled to qualified immunity unless he or she violated clearly established law of which a reasonable person should have known. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 2732 (1982). When evaluating the issue of qualified immunity, the court must follow a two-part test for qualified immunity announced in Saucier v. Katz: (1) whether the facts alleged "show [that] the officer[s'] conduct violated a constitutional right"; and (2) whether the constitutional right in question was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. 194, 201-02 (2001); *see also* Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir.2002).

REPORT AND RECOMMENDATION
Page - 7

1    Defendants argue they are entitled to qualified immunity because the state law clearly states that an EMP may be revoked at any time, and thus it was reasonable for prison officials to revoke the EMP without giving Mr. Beasley notice or a hearing to contest the revocation.  As discussed above, the court finds no violation or cognizable claim based on plaintiff's U.S. Constitutional procedural due process claim, which is the issue specifically addressed by defendants' qualified immunity claim.

Defendants however do not address the issue of a state created procedural due process right in context of qualified immunity.  *Sandin*'s atypical and significant hardship standard, which has been clearly established since 1995, and as noted above, the facts may also support a state created procedural due process claim.  In addition, a substantive due process claim may be supported when the allegations of hardship, medical need and treatment are viewed in favor of plaintiff, and defendants also do not address substantive due process in their qualified immunity argument.

Defendants' qualified immunity claim must fail.

## CONCLUSION

Based on the foregoing discussion, the Court should deny defendants' motion for summary judgment.  In addition, the court should forward this matter to the court's pro bono panel for review and possible appointment of counsel to insure that Mr. Beasley's interests and legal rights are properly represented in this matter.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **May 12, 2006**, as noted in the caption.

DATED this 21st day of April, 2006.

/s/ J. Kelley Arnold
J. Kelley Arnold
United States Magistrate

REPORT AND RECOMMENDATION
Page - 8